UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

JEFFREY LAX, SUSAN ARANOFF, RINA YARMISH,
MICHAEL GOLDSTEIN, and MICHELLE DAVIDOWITZ,

                        Plaintiffs,

             – against –

THE CITY UNIVERSITY OF NEW YORK, THE
PROFESSIONAL STAFF CONGRESS, THE NEW
CAUCUS OF THE PROFESSIONAL STAFF CONGRESS,
CLAUDIA V. SCHRADER, MICHAEL SPEAR, JAMES
DAVIS, MICHAEL VALENTE, MARGARET FEELEY,
DOMINIC WETZEL, EMILY SCHNEE, BARBARA
BOWEN, MATTHEW GARTNER, ANTHONY
ALESSANDRINI, ELIZABETH DILL, KATHERINE
PEREA, LIBBY GARLAND, and PATRICK LLOYD,

                        Defendants.

-----------------------------------------------------------------------X

Civil Action No.: 1:22-cv-6793

**COMPLAINT AND JURY
DEMAND**

       Plaintiff JEFFREY LAX ("Plaintiff Lax"), Plaintiff SUSAN ARANOFF

("Plaintiff Aranoff"), Plaintiff RINA YARMISH ("Plaintiff Yarmish"), Plaintiff

MICHAEL GOLDSTEIN ("Plaintiff Goldstein"), and Plaintiff MICHELLE

DAVIDOWITZ ("Plaintiff Davidowitz"), by and through their counsel, The ZWEIG

LAW FIRM, P.C. as and for their Complaint against THE CITY UNIVERSITY OF NEW

YORK ("CUNY"), THE PROFESSIONAL STAFF CONGRESS (the "Union"), THE

NEW CAUCUS OF THE PROFESSIONAL STAFF CONGRESS ("New Caucus"),

CLAUDIA V. SCHRADER ("Schrader"), MICHAEL SPEAR ("Spear"), JAMES DAVIS

("Davis"), MICHAEL VALENTE ("Valente"), MARGARET FEELEY ("Feeley"),

DOMINIC WETZEL  ("Wetzel"), EMILY SCHNEE ("Schnee"), BARBARA BOWEN

("Bowen"), MATTHEW GARTNER ("Gartner"), ANTHONY ALESSANDRINI ("Alessandrini"), ELIZABETH DILL ("Dill"), KATHERINE PEREA ("Perea"), LIBBY GARLAND ("Garland"), and PATRICK LLOYD ("Lloyd") allege upon knowledge as to themselves and their own actions and upon information and belief as to all other matters and respectfully alleges to this Court as follows:

## NATURE OF THE ACTION

1.      This is an action to recover damages for discrimination and harassment on the basis of religion in the terms, conditions and privileges of employment under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e, *et seq.* ("Title VII"), the New York Executive Law §290, *et seq.* ("NYSHRL") and the Administrative Code of the City of New York §8-107, *et seq.,* ("NYCHRL"), retaliation in violation of Title VII, NYSHRL and NYCHRL and assault and false imprisonment.

## JURISDICTION

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 28 U.S.C. 1343(4), and 28 U.S.C. §1367.

## VENUE

3.      Venue is proper in the Eastern District of New York, pursuant to 28 U.S.C. §1391, because the Eastern District of New York is the judicial district in the state in which the unlawful employment practices are alleged to have been committed.

## PREREQUISITES

4.      Plaintiff Lax filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was accepted for filing and investigation.

5.      On July 5, 2022, the EEOC issued a Notice of Right to Sue ("Right-to-Sue Letter") which permitted Plaintiffs to file a civil action within 90 days of Plaintiffs' receipt of the Right-to-Sue Letter.

6.      Plaintiffs commence this action within 90 days of the receipt of the Right-to-Sue Letter.

7.      Before filing the complaint in this action, Plaintiffs caused a copy of the same to be served upon the Corporation Counsel of the City of New York and the New York City Commission on Human Rights.

## **PARTIES**

8.      At all relevant times, Plaintiff Lax was and still is a resident of the State of New York.

9.      At all relevant times, Plaintiff Aranoff was and still is a resident of the State of New York.

10.     At all relevant times, Plaintiff Yarmish was and still is a resident of the State of New York.

11.     At all relevant times, Plaintiff Goldstein was and still is a resident of the State of New Jersey.

12.     At all relevant times, Plaintiff Davidowitz was and still is a resident of the State of New Jersey.

13.     Plaintiffs are each Observant Jewish.

14.     At all times material herein, Plaintiffs were each an "employee" of CUNY entitled to protection within the meaning of Title VII, the NYSHRL and the NYCHRL

15.     Defendant "CUNY" is the public university system of the City of New York,

which is organized and existing under and by virtue of the laws of the State of New York and New York City to administer and maintain twenty-three (23) educational institutions including, but not limited to, Kingsborough Community College ("Kingsborough").

16.     At all relevant times, CUNY has employed over twenty (20) full-time employees and is an "employer" within the meaning of Title VII, the NYSHRL and the NYCHRL.

17.     Defendant, PROFESSIONAL STAFF CONGRESS (the "Union" or "PSC") is a "labor organization" as defined in Title VII, the NYSHRL and the NYCHRL.

18.     Defendant THE NEW CAUCUS OF THE PROFESSIONAL STAFF CONGRESS ("New Caucus") is a political party of the Union.

19.     The New Caucus actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

20.     At all relevant times, Defendant, CLAUDIA V. SCHRADER ("Schrader"), was the president of Kingsborough Community College.

21.     Schrader actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

22.     Upon information and belief, Schrader is a resident of the City and State of New York.

23.     At all relevant times, Defendant, MICHAEL SPEAR ("Spear"), was a Kingsborough professor, an officer of the Union and upon information and belief was an officer of the New Caucus.

24.     Spear actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

25.     Upon information and belief, Spear is a resident of the City and State of New York.

26.     At all relevant times, Defendant, JAMES DAVIS ("Davis"), was the president of the Union and upon information and belief was an officer of the New Caucus.

27.     Davis actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

28.     Upon information and belief, Davis is a resident of the City and State of New York.

29.     At all relevant times, Defendant MICHAEL VALENTE ("Valente"), was the Chief Diversity Officer of Kingsborough Community College.

30.     Valente actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

31.     Upon information and belief, Valente is a resident of the City and State of New York.

32.     At all relevant times, Defendant MARGARET FEELEY ("Feeley"), was a Kingsborough professor, an officer of the Union, a high-ranking member of the CUNY-wide PSC Executive Council and a member of the New Caucus.

33.     Feeley actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

34.     Upon information and belief, Feeley is a resident of the City and State of New York.

35.     At all relevant times, Defendant DOMINIC WETZEL ("Wetzel"), was a Kingsborough professor, a delegate of the Union and upon information and belief was an

officer of the New Caucus.

36.     Wetzel actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

37.     Upon information and belief, Wetzel is a resident of the City and State of New York.

38.     At all relevant times, Defendant EMILY SCHNEE ("Schnee"), was a Kingsborough professor, a delegate of the Union and a member of the New Caucus.

39.     Schnee actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

40.     Upon information and belief, Schnee is a resident of the City and State of New York.

41.     At all relevant times, Defendant BARBARA BOWEN ("Bowen"), was the president of the Union and upon information and belief was a member of the Governing Board of the New Caucus.

42.     Bowen actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

43.     Upon information and belief, Bowen is a resident of the City and State of New York.

44.     At all relevant times, Defendant MATTHEW GARTNER ("Gartner"), was a Kingsborough professor and a member of the New Caucus.

45.     Gartner actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

46.     Upon information and belief, Gartner is a resident of the City and State of New

York.

47.    At all relevant times, Defendant ANTHONY ALESSANDRINI ("Alessandrini"), was a Kingsborough professor.

48.    Alessandrini actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

49.    Upon information and belief, Alessandrini is a resident of the City and State of New York.

50.    At all relevant times, Defendant ELIZABETH DILL ("Dill"), was a Kingsborough professor and a member of the New Caucus.

51.    Dill actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

52.    Upon information and belief, Dill is a resident of the City and State of New York.

53.    At all relevant times, Defendant KATHERINE PEREA ("Perea"), was a Kingsborough professor and a member of the New Caucus.

54.    Perea actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

55.    Upon information and belief, Perea is a resident of the City and State of New York.

56.    At all relevant times, Defendant LIBBY GARLAND ("Garland"), was a Kingsborough professor and a member of the New Caucus.

57.    Garland actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

58.     Upon information and belief, Garland is a resident of the City and State of New York.

59.     At all relevant times, Defendant PATRICK LLOYD ("Lloyd"), was a Kingsborough professor and a member of the New Caucus.

60.     Lloyd actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

61.     Upon information and belief, Lloyd is a resident of the City and State of New York.

62.     This action arises out of Defendants' wrongful, illegal, and tortious conduct within the State of New York and the City of New York.

<u>**BACKGROUND OF PLAINTIFFS'**</u>
<u>**EMPLOYMENT**</u>

63.     Plaintiff Lax earned a Bachelor of Science degree in Business, Management, and Finance in 1995 from Brooklyn College.

64.     Plaintiff Lax earned a Juris Doctor in 1998 from Benjamin N. Cardozo School of Law, Yeshiva University.

65.     Plaintiff Lax earned a Masters of Business Administration degree in 2000 from City University of New York - Baruch College - Zicklin School of Business.

66.     Before commencing his employment by Kingsborough, Plaintiff Lax practiced law and worked at various colleges as an adjunct professor.

67.     Plaintiff Lax commenced his employment by CUNY in 2000.

68.     Plaintiff Lax commenced his employment by Kingsborough in 2004 with the title or position of Assistant Professor.

69.     Kingsborough assigned Plaintiff Lax to its Business Department.

70.     Plaintiff Lax earned tenure approximately five (5) years after commencing his employment by Kingsborough.

71.     In approximately 2010, Kingsborough promoted Plaintiff Lax to the title or position of Associate Professor.

72.     In 2011, Plaintiff Lax became the Chairperson of the Business Department, which includes the responsibility to supervise over 50 faculty and office staff members.

73.     In approximately October 2013, Kingsborough promoted Plaintiff Lax to the title or position of Professor.

74.     Plaintiff Lax has consistently received excellent peer evaluations and student evaluations and has published scholarly articles.

75.     At all times during the course of his employment by Kingsborough, Plaintiff Lax performed his services competently, faithfully, diligently, and in an outstanding manner.

76.     Plaintiff Aranoff earned a Bachelor of Arts degree from Barnard College in 1969.

77.     Plaintiff Aranoff earned a Master of Philosophy degree from Columbia University in 1972 and a Doctor of Philosophy degree from Columbia University in 1986.

78.     Professor Aranoff taught as an adjunct instructor at Hofstra University in 1974.

79.     Professor Aranoff was the Instructor and Chair of Economics Department of the College of Mount St. Vincent from 1978 to 1982.

80.     Professor Aranoff began teaching at Kingsborough in 1983 through the present. During this time, she has held the positions of Instructor, Assistant Professor, Associate Professor, and Professor.

81.     Plaintiff Aranoff has consistently received excellent peer evaluations and

student evaluations and has published scholarly articles.

82. At all times during the course of her employment by Kingsborough, Plaintiff Aranoff performed her services competently, faithfully, diligently, and in an outstanding manner.

83. Plaintiff Yarmish earned Master of Science and PhD degrees from New York University's Graduate School of Engineering.

84. Prior to her employment at Kingsborough, Plaintiff Yarmish worked as an experienced programmer and analyst. Her project work included programming modifications to the diagnostic system for the Poseidon Navigation Complex, real-time systems development for the Perkin Elmer Corporation, and such business-related projects as payroll and inventory systems for both private and public concerns.

85. Plaintiff Yarmish has served as the Chairperson of the Department of Mathematics and Computer Science at Kingsborough since 1997. At the time of her election as department chair, Plaintiff Yarmish was the first woman to be chosen as chair of a Science, Technology, Engineering, and Mathematics ("STEM") department at Kingsborough.

86. During Plaintiff Yarmish's tenure as Chairperson, the Mathematics and Computer Science department and its faculty have increased in four-fold in size.

87. Plaintiff Yarmish has consistently received excellent peer evaluations and student evaluations and has published scholarly articles in the areas of mathematics, mathematics education and computer languages. Plaintiff Yarmish has also authored three well-received books on computer languages for large publishing houses, including Addison-Wesley, Science Research Associates and Prentice-Hall. Her seminal text, "Assembly Language Fundamentals," was translated by Mir Publishers (Moscow) into Russian and by

Dewan Bahasa dan Pustaka into Bahasa-Malaysian.

88.     At all times during the course of her employment by Kingsborough, Plaintiff Yarmish performed her services competently, faithfully, diligently, and in an outstanding manner.

89.     Plaintiff Goldstein earned a Bachelor of Arts degree from Bennington College in 1985.

90.     Plaintiff Goldstein earned a Juris Doctor degree from the City University School of Law in 1989.

91.     From September 1989 to September 1992, Plaintiff Goldstein worked as the Assistant Director of Executive Education Programs at Baruch College, a CUNY college.

92.     From September 1992 to June 1996, Plaintiff Goldstein worked as the Assistant Director Law and Justice Institute Teacher at the New York City Board of Education.

93.     From September 1996 to August 1999, Plaintiff Goldstein worked as the Director of Graduate Admissions at Hunter College, a CUNY college.

94.     Plaintiff Goldstein has worked at Kingsborough since September 1999 in various positions, including: Associate Administrator Continuing Education; Assistant to Vice President of College; Advancement Director of Alumni Relations; Director of Public Relations; and his current position of Director of Kingsborough Experience.

95.     Plaintiff Goldstein's father, Leon M. Goldstein, was President of Kingsborough for 29 years, as well as the Acting Chancellor of CUNY for two years and worked at CUNY in various positions for more than 45 years.

96.     Plaintiff Goldstein's mother, Mary Goldstein, was the former Dean of Academic Affairs at CUNY Central, as well as Vice President of the John Jay College of

Criminal Justice, and worked at CUNY for more than 40 years.

97.     At all times during the course of his employment by Kingsborough, Plaintiff Goldstein performed his services competently, faithfully, diligently, and in an outstanding manner.

98.     Plaintiff Davidowitz earned a Bachelor of Science degree in Accounting from Queens College.

99.     Plaintiff Davidowitz earned a Masters in Business Administration in Finance from Baruch College in 1999.

100.    Prior to working at Kingsborough, Plaintiff Davidowitz practiced accounting for various companies and firms and received a Certified Public Accountant ("CPA") license.

101.    Plaintiff Davidowitz began working for Kingsborough in January 2012 as a substitute assistant professor. In or around the fall of 2012, Plaintiff Davidowitz became a full-time assistant professor.

102.    Plaintiff Davidowitz received tenure in 2019.

103.    At all times during the course of her employment by Kingsborough, Plaintiff Goldstein performed her services competently, faithfully, diligently, and in an outstanding manner.

## HOSTILE WORK ENVIRONMENT & DISPARATE TREATMENT

104.    The Plaintiffs are all religiously Observant and/or Zionist Jews. An Observant Jewish identity typically entails engaging in various Jewish religious practices and beliefs such as: the observance of kosher-dietary laws; the observance of the Jewish Sabbath from Friday evening to Saturday evening; and the wearing of clothing or accessories that outwardly identify a person as being Jewish. This is by no means an exhaustive list. A Zionist identity refers to a

deep ethnic or religious connection between the Land of Israel and the Plaintiffs' Jewish religion or ethnicity.

105.   During Plaintiffs' employment by Kingsborough, Defendants created, promoted, and maintained a pervasively hostile work environment and atmosphere and subjected the Plaintiffs to disparate treatment.

106.   Defendants engaged in a systematic policy or practice of discrimination that commenced in approximately 2018 and continues today.

107.   Plaintiffs are faced with harassment of such quality that a reasonable person, in the same circumstances, would find that the conditions of his or her employment had altered.

108.   Despite their outstanding work performance, Plaintiffs were treated less favorably and with hostility by Defendants as compared with similarly situated non-Observant Jewish employees or non-Zionist Jewish employees.

109.   Plaintiffs and other Observant or Zionist Jewish faculty and staff members at Kingsborough have faced pervasive, anti-religious or ethnic discrimination from a particular segment of fellow faculty members who are the leaders of a faculty group called the Progressive Faculty Caucus of Kingsborough Community College (the "PFC") and are also members of the New Caucus.

110.   On or about February 26, 2021, the Plaintiffs filed action in New York State Supreme Court, Kings County on state claims of harassment, discrimination and retaliation.

111.   The present action is relative to discriminatory practices and disparate treatment occurring from 2018 through the present at the hands of the PFC, the Union, the New Caucus, and CUNY.

112.   Upon information and belief, the PFC was formed in or about late 2016 or early

2017 with the purported purpose of advancing various "progressive" initiatives on the Kingsborough campus.

113.    In or about September 2017, Plaintiffs contacted PFC leaders Wetzel and Spear requesting entry into the PFC. Plaintiff Lax has a long and considerable history promoting various progressive causes including women's workplace rights and LGBTQ rights. As such, Plaintiff Lax was interested in gaining admission to the PFC. The other Plaintiffs were also interested in joining the PFC.

114.    In a clear and recognizable pattern of discrimination, the Plaintiffs and every other Observant and/or Zionist Jewish applicant to the PFC were denied entry. Upon information and belief, at least six Observant and/or Zionist Jews were denied acceptance into the PFC; there are no Observant and/or Zionist Jewish members of the PFC, and *no other* applicants were denied acceptance to the PFC.

115.    With the exception of Observant and/or Zionist Jews, PFC application requests are routinely and immediately approved without scrutiny. At one point, the PFC boasted of the power the group had gained at Kingsborough, dubbing itself "The Hundred," an indication of both their membership figure and the corresponding increase in PFC influence at the college. Simply stated, with those membership totals, the PFC and the New Caucus could (and did) typically dominate campus elections at the will of its leadership and routinely lobbied against Observant Jewish candidates running for election.

116.    In another demonstration of prejudice, a PFC organized anti-discrimination event was scheduled on a Friday night, admittedly with the purpose of excluding Sabbath-observant Jewish faculty members.

117.    On February 26, 2018, PFC leader, Professor Elizabeth Dill distributed an email

to all faculty on the Kingsborough email system on behalf of the PFC, soliciting discrimination complaints from faculty members to be strategized and discussed at a PFC discrimination event (the "Friday Night Event"). In the email, Dill stated that "[t]he Progressive Faculty Caucus is trying to gather information about discrimination against faculty at Kingsborough. We would like to come together so that we can share our stories and discuss what steps we want to take. If you have experienced discrimination on the basis of race, sexual orientation, gender identity, ability, or ethnicity, please RSVP, using a non-Kingsborough email account, to elizabethadill@gmail.com."

118.   In addition to the discriminatory timing issue, the organizers of the Friday Night Event, by their own admission, purposefully excluded anti-religious discrimination from the list of issues to be addressed.

119.   After several college-wide complaints, by both Jewish and non-Jewish faculty members regarding both the scheduling of the Friday Night Event and its disquieting exclusion of religion as a discrimination category, various PFC leaders responded by obstinately and repeatedly refusing to change either aspect of the event. Instead, they suggested that excluded individuals should schedule their own, separate, event to address discrimination issues that were important to them. For example, in an email dated March 8, 2018, PFC leader Anthony Alessandrini responded to this concern in an e-mail to the entire campus saying that those concerned about the exclusion of Observant Jews and Religious Discrimination Complaints not being permitted at the event should "go ahead and organize some other, different things, things that better fit their vision of how things should be organized."

120.   At times, with the financial and advisory support of Union and New Caucus leaders, PFC members have also called for the removal of Observant and/or Zionist Jewish

faculty members, administrators, department chairs, and others at Kingsborough, including Plaintiff Lax, Plaintiff Aranoff and Plaintiff Yarmish, and others, based on various pretexts that are in reality due to the religious ideology and/or practice of those individuals. Internally, including on the PFC's e-mail listserv, the observance levels and Zionistic religious beliefs of those Jewish union members were actively discussed as reasons they were targeted for removal. A former member of the PFC informed Plaintiff Lax that there were discussions between Wetzel and others that Observant Jews were undesirable for PFC membership because of a blanket belief that they "tend" to be homophobic and Zionist. PFC and New Caucus members also wrote in the Progressive Labor Party Challenge ("PLP Challenge"), a communist newspaper that circulates on the Kingsborough campus, complaining of their "struggle" against a "network of Zionists" among the faculty at Kingsborough. The PFC distributes this paper throughout the Kingsborough campus and even removes the College Student paper from their receptacles throughout campus, replacing them with the PLP Challenge paper. PFC and New Caucus members also complained in a publicly distributed campus survey that "zionist [sic] faculty" engender "oppression" and control the campus. Also, in a February 13, 2018 email to the entire campus, Alessandrini attacked Jews who brought claims of anti-Semitism at Kingsborough, saying that they "reduce the charge of anti-Semitism to a weapon that can be brandished against one's political opponents…through the use of spurious lawsuits."

121.    Around the same time, the Kingsborough campus was suffering numerous other anti-Judaic and anti-Semitic incidents. On February 22, 2018, a photograph of Plaintiff Goldstein's late father, former Kingsborough President Leon Goldstein, was found defaced with anti-Semitic graffiti that read, "Fuck Trump. Kill the Zionist Entity."

122.    The day before the aforementioned vandalized picture was found, PFC member Katherine Perea ("Perea") had complained to an administrator about private Facebook posts by Plaintiff Goldstein that offended her and demanded that he be fired. When she was told that Plaintiff Goldstein would not be fired, she stated, "Then, I guess I will have to handle this myself." Perea, baselessly and without merit, described Plaintiff Goldstein's views as "anti-Muslim," "pro-slavery," "anti-trans," and "anti-gay" and urged that his classes be taken away. Perea undertook this campaign despite her admission that she had never met, spoken with, nor had any direct contact with Plaintiff Goldstein whatsoever. CUNY took no actions against Perea, who continued to engage in a malicious and relentless campaign to get Plaintiff Goldstein fired, making this demand to various administrators, including the then-college-interim-President.

123.    The harassment of Plaintiff Goldstein escalated on May 30 and May 31, 2018 when hundreds of flyers calling for the firing of Plaintiff Goldstein were distributed to students by at least one PFC and New Caucus member and placed in offices and nearly every classroom around the Kingsborough campus. The flyers attributed false allegations of racism to Plaintiff Goldstein and included a forged image that was attributed to his private Facebook page despite having not been posted there. The flyers also called on students to demand the termination of Plaintiff Goldstein and to fight his purported racism and sexism.

124.    Around the same time, articles authored by PFC members appeared in the PLP Challenge, on the Kingsborough campus, describing the PFC's struggle against a "network of Zionists among the faculty." An internal PFC email wrote of the necessity to "bring violence to the Zionists on campus."

125.    On October 4, 2018, attorneys representing Plaintiff Goldstein sent a litigation

hold letter to various PFC and New Caucus members. Within hours, two nails were found in a tire of Plaintiff Goldstein's car and two nails were found in two different tires of Plaintiff Lax's car. It was the third or fourth time that Plaintiff Lax had found nails in his tires over the previous few months. The uncanny timing, obvious coordination, and sheer frequency of these attacks against Plaintiff Goldstein's and Plaintiff Lax's property are chilling when it is observed that they began occurring after PFC and New Caucus member threats to "bring violence to the Zionists" on Kingsborough's campus and in close proximity to other attacks against Plaintiff Goldstein.

126.    Despite this wide-spread display of anti-Semitic discrimination on the Kingsborough campus, neither CUNY, the Union nor the New Caucus have taken any steps to curtail such prejudice and have unfortunately, actively attempted to suppress the investigatory process.

127.    Wide-ranging complaints of religious discrimination against Observant Jews were filed against the PFC Leadership with Kingsborough Chief Diversity Officer Victoria Ajibade ("Ajibade") in or around March 2018.

128.    On March 12, 2018, Ajibade distributed an email to all faculty stating that complaints of religious discrimination against Jews had been filed against the PFC. Ajibade stated that it was her "fervent hope that members of the PFC would give additional, meaningfully [sic] consideration to the possibility of rescheduling [the Friday Night Event] to a date and time that would allow for more inclusive faculty participation."

129.    Union leaders, including Barbara Bowen ("Bowen"), the president of the Union, applied pressure to Ajibade to suppress the investigation of the Friday Night Event matter, including Bowen demanding and threatening Ajibade to decline to investigate. Most

stunningly, the Union filed a Professional Misconduct complaint *against* Ajibade in order to prevent her from fulfilling her duty to investigate the complaints of anti-Semitism on campus. During a witness interview that Ajibade conducted with Plaintiff Lax on July 12, 2018, Ajibade revealed that the PFC, through the Union, had "registered a complaint of misconduct against me [that is, Ajibade] anonymously," and were intimidating her to end the investigation. Within weeks of receiving these threats, Ajibade left Kingsborough under suspicious circumstances and Kingsborough neglected to hire a new Chief Diversity Officer for approximately a year. Immediately after Ajibade revealed that the Union had targeted her for investigation because she was investigating the PFC and upon leaving CUNY, Spear, a Union officer, went around campus boasting that "there is no [anti-Semitism-related] investigation against the PFC." Spear bragged that the investigation had been "taken care of" and that the PFC had "nothing to worry about."

130.    On April 4, 2019, Plaintiff Lax attended an open-invitation, public informational event held by the New Caucus during the Union election campaign. Plaintiff Lax sat quietly in attendance, trying to simply listen to the speakers, play the "Bingo" game that was distributed and decorate the postcards that were handed out with colored markers. Not allowed to simply sit peacefully in attendance, Plaintiff Lax was simultaneously accosted at the event by five PFC members, including two Union officials. The two Union officials involved in the attack were running for the top levels of the New Caucus slate: Emily Schnee ("Schnee") for chapter chair; and Wetzel for chapter vice chair. At the start of the event, when Plaintiff Lax first walked in, Wetzel refused to shake the politely extended hand of Plaintiff Lax, whipping his hand backwards to avoid the professional gesture. Though hurt, Plaintiff Lax did not confront Wetzel about the insult, and instead proceeded to move on to a table and

sit down quietly. Oddly, after rejecting a handshake gesture, Wetzel nevertheless followed Plaintiff Lax to the table and sat down at the end, near Plaintiff Lax, confining Plaintiff Lax physically in between himself (Wetzel) and PFC member, Matthew Gartner ("Gartner"), who was on Plaintiff Lax's right side. Immediately upon seeing Plaintiff Lax, Gartner began harassing Plaintiff Lax and pelting him with vitriol and probing and attacking questions. After the event speakers concluded, Plaintiff Lax attempted to get up to leave in order to avoid further badgering and attack, but was not allowed to do so, as he was immediately surrounded and cornered, first simultaneously by Wetzel and Gartner from either side (both simultaneously bullying and bombarding Plaintiff Lax with verbal attacks and cruel comments) and quickly thereafter by three additional PFC members: Alessandrini, Union Official Schnee, and Libby Garland, in a coordinated fashion. Surrounded by all five in close proximity, Plaintiff Lax was physically restrained from leaving and was simultaneously badgered mercilessly and cruelly by as many as four of the five individuals. At one point when Plaintiff Lax attempted to leave, Gartner held his hand above Plaintiff Lax to stop him and said, "No. We're not done. We're just starting. We're just starting."

131.    Additionally, PFC and New Caucus members regularly, and sometimes cruelly, lobbied in a multitude of college elections against any candidates that were Observant or Zionist Jews. Plaintiff Lax was a victim of this discriminatory and illegal practice when PFC members lobbied against him due to his religious beliefs when he ran for an elected position in or around September 2017. Three years prior to that, before the PFC came into power, Plaintiff Lax, well respected at the college, ran in election for the same position and at that time accumulated more votes than any candidate at the college. It is worth noting that when the PFC and New Caucus members successfully lobbied against Plaintiff Lax during the

September 2017 election, they made various disparaging allegations against the Plaintiff Lax despite the fact that almost none of the PFC lobbyists had ever met Plaintiff Lax, nor ever had a personal conversation with him. Plaintiff Lax was not the only Observant or Zionist Jew against whom PFC and New Caucus members viciously lobbied. Professor Eric Rothenburg, an Observant Jew, was mercilessly mocked and berated on the campus e-mail system by PFC members during a Faculty Senate election and Plaintiff Aranoff was also lobbied against by PFC members. The vicious and cruel approach that PFC Respondents have taken during these elections is part of a repugnant strategy that has nevertheless been extremely effective. It has intimidated and discouraged Observant and Zionist Jews from choosing to run for elected positions at Kingsborough.

132.    In or around November 2018, Plaintiff Lax collegially inquired of PFC and New Caucus members and Union officials, Spear and Wetzel regarding running with their New Caucus slate in the Union election. Wetzel was extremely rude about Plaintiff Lax's request, challenging Plaintiff Lax with several bizarre queries, including, "are you pro union?" Wetzel even suggested that Plaintiff Lax run with the other slate, offensively tying Plaintiff Lax to Plaintiff Yarmish's slate, presumably because both were Observant Jews. Plaintiff Lax's request was ignored by Spear, and was ultimately directed to Gartner, who provided the demonstrably false pretext to Plaintif Lax that he could not run with the New Caucus slate because it was full. In truth, the slate was far from finalized during the period that Plaintiff requested consideration.

133.    Plaintiff Lax was also discriminated against in being denied participation in Kingsborough Community College Annual Women's Month in March 2018. Plaintiff Lax made multiple requests to Perea to participate and present at this event, all of which were

denied. This is despite the fact that Plaintiff Lax has written extensively on women's rights in the workplace, is a staunch advocate for those rights and is regarded as a scholar in that area. Upon information and belief, this denial was due to Plaintiff Lax's religious beliefs. At one point, Perea informed Plaintiff Lax that the decision on denial was that of her colleague, Red Washburn. According to Perea, Washburn did not want men to present on the panel. This was an obvious pretextual excuse, as another man, PFC-leader Dominic Wetzel, was in fact invited to present on that year's panel. Unlike Plaintiff Lax's extensive resume and expertise on the topic, Wetzel had no scholarship related to women's rights whatsoever, and was stunningly unqualified to present on the issue. Worse yet, Wetzel's invitation to present instead of Plaintiff Lax was extended after Wetzel had sent an extremely offensive, sexist e-mail to the entire campus in which he complained about "barefoot and pregnant women" teaching on Kingsborough's campus. So offensive was the email that multiple women came forward to complain and Wetzel was reprimanded by the college. Yet, because of Plaintiff Lax's religion and due to Wetzel's PFC affiliation, Wetzel was invited and Plaintiff Lax was rejected.

134.   The Kingsborough campus was also beset by many incidents of anti-Semitism against Observant Jewish students.

135.   In an October 2015 post on ratemyprofessor.com, one student wrote regarding Professor Gartner:

> "Here's the deal, I'm Jewish and needed to take off 2 days in order to observe the holidays, all other professors said no problem and he told me it's my fault and if I didn't like it I should have gone to a Jewish School (something he is not allowed to say). I felt so disgusted by him I was forced to drop his class and file a report and now 3 crds [sic] short."

136.   In another unfortunate incident of anti-religious bias against Jewish students, a PFC professor prevented a student from the Jewish student group, Yavneh, from placing her

promotional table at a student function despite her having reserved the space beforehand. Kingsborough's Director of Public Safety, James Capozzi, refused to take action against the PFC professor despite being aware that the PFC professor had targeted the group and stolen their table in violation of college policy. Shockingly, he declined to take action, saying, "I do not want to start with those people [the PFC]."

137.    In another incident, Perea and another PFC faculty member encouraged an Observant Jewish student to participate in a special public forum, but every time the Jewish student spoke, Perea and the other professor repeatedly and rudely interrupted him. They repeatedly told the student that he is "white" and that he has "white privilege" and that if he only took off his religious headwear he would be like "all the other white men."

138.    Additionally, on December 2, 2019, vilely anti-Semitic flyers were distributed on campus accusing religious Jews of bathing in urine and feces and being purposeful vectors of disease, among other obscenities.

139.    In May 2021, a Kingsborough student severely beat an Orthodox Jewish pedestrian with a baseball bat, blocks from the Kingsborough campus, while yelling "Kill All the Jews! Free Palestine!" He was charged with a hate crime. Nonetheless, Kingsborough President Claudia Schrader ("Schrader") declined to condemn this attack after repeated requests from Plaintiff Lax to do so, and despite her condemnations of other racist incidents. Indeed, Brooklyn College, another CUNY school in Brooklyn, did condemn this violent hate crime, though it was not even committed by their own student.

140.    CUNY has completely failed to address, remedy or even acknowledge the severe and pervasive anti-religious discrimination and hostile work environment on campus. A U.S. Equal Employment Opportunity Commission ("EEOC") investigation of the incidents

alleged in this complaint found that the Defendants "failed to take corrective action despite the numerous complaints it received in connection with religious discrimination."  Moreover, an investigation conducted by CUNY's outside counsel, Jackson Lewis P.C. (the "Jackson Lewis Investigation") regarding the scheduling of the Friday Night Event, found that the Plaintiffs and other Observant Jews were discriminated against in violation of CUNY Policy and State and Federal Law, in that Plaintiff Lax's "observance of the Jewish sabbath was used to prevent him from attending a PFC meeting" and that "in using his religious observance to exclude him, the PFC treated Lax less favorably based on his religion." Despite these damning findings, CUNY still refused to take any remedial action to cure these discriminatory practices. Appeals directly to Defendant Schrader to address the discriminatory practices on campus have been ignored on numerous occasions.

141.    Additionally, the Plaintiffs have faced retaliatory action for bringing light to the anti-religious discrimination on campus. In November 2020, Gartner proposed a measure to be added to the College Governance which provided that "Members of faculty review committees will not vote on candidates under consideration by their committee if the review committee member has brought legal action or other formal complaints or adjudicatory procedures (excluding mandatory complaint referrals) against said candidate."

142.    It is important to note that the proposed amendment was not concerned with recusing the alleged perpetrator from voting but rather only removing, disqualifying, and penalizing the victim. While this proposal was ultimately denied, it has a chilling and suppressive effect on faculty members who wish to complain of discrimination on the Kingsborough campus, and the fact that it was even submitted for a formal vote by President Schrader, who rejected complaints about its legality by multiple individuals, is striking.

143.    In another particularly egregious example of retaliation, in or around May 2018, Meg Feeley, a Union officer, outrageously filed with Ajibade a complaint of "harassment" against Plaintiff Lax, whom she had never spoken to nor met, because, she admitted, she was bothered that he was documenting claims based on religious discrimination. This retaliatory, and itself harassing, "harassment" allegation revolved around one short, professional, and courteous work-related email sent by Lax which Feeley herself admitted was "cordial" in her harassment complaint.

144.    Additionally, on March 13, 2018, defendant, Professor Lloyd sent an email to the entire campus stating: "As the College collapses due to low enrollment and lack of funds, the true nature of Professors Yarmish and Lax come out for the world to see. 'Mine, mine, mine,' just like the seagulls in Finding Nemo. Let's see, suing Stu Suss for being anti-Semitic. Now accusing the PFC of being anti-Semitic. My only hope is that out of all the mess on campus, the math department ends up with a new Chair." Needless to say, this had a greatly chilling and suppressing effect on the complaints regarding discriminations.

145.    Additional failures by Kingsborough and CUNY to address discrimination were manifested when Plaintiff Lax and other professors made complaints to Michael Valente ("Valente"), who became Kingsborough's Chief Diversity Office in mid or late 2019. After a student reported an incident of an adjunct professor calling a student a "stupid pig" in German (a phrase which has ugly Nazi connotations), Plaintiff Lax reported the incident to Defendant Valente. However, Valente rudely denied that there was any way that the phrase was discriminatory and refused to investigate. Valente did not even wish to learn whether the victim was Jewish.

146.    Defendant Valente also refused to investigate complaints by multiple Observant

Jewish professors that Wetzel refused to shake their hands despite the well-documented context of Wetzel's anti-religious behavior as outlined above.

147.    On February 11, 2021 the EEOC issued a Letter of Determination (attached hereto as **Exhibit A**) which found that the Plaintiffs and other Observant Jewish faculty were discriminated against. Of particular note, the EEOC determined that:

> *The Commission's investigation reveals that Charging Party and other similarly situated individuals were discriminated and retaliated against because of their religion; including, that Respondent rejected Charging Party and other similarly situated individuals' membership of the Professional the Progressive Faculty Caucus of Kingsborough Community College. In addition, witness testimony corroborates that Respondent failed to take corrective action despite the numerous complaints it received in connection with religious discrimination. Based on the above, Respondent's asserted defenses do not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated and retaliated against Charging Party and other similarly situated individuals on the account of religion and that it failed to take immediate corrective action creating a hostile working environment, all in violation of Title VII of the Civil Rights Act 1964, as amended.*

148.    Even after the EEOC notified Defendants of wide-ranging findings of religious discrimination, retaliation, and hostile work environment against Plaintiff Lax, on February 23, 2021, President Schrader has taken no corrective or disciplinary action, nor any action or so much as a single attempt to engage or communicate with Plaintiff Lax in an effort to correct the significant wrongs substantiated by the EEOC. In fact, Defendant Schrader has rejected repeated requests by Plaintiff Lax to respond to the EEOC findings and to take corrective measures.

149.    Not only did Defendant Schrader refuse to remedy or even address the hostile work environment on campus, but she engaged in repeated retaliatory behavior against Professor Lax.  In February, 2021, less than two weeks after the Commission issued its Letter of Determination finding there was discrimination against Plaintiff Lax, Defendant Schrader

publicly distributed a "Campus Climate Survey" wherein PFC members wrote multiple vile, retaliatory, and antisemitic attacks against Plaintiff Lax and mocking his EEOC-substantiated discrimination claims. These PFC members included what is among the most commonly recognized of antisemitic tropes in the survey: accusing Plaintiff Lax of being a so-called "Zionist Oppressor."

150.   While the above-mentioned survey and comments were promised to be anonymous, with names redacted, one name, and only one name, was made public: Plaintiff Lax's. Plaintiff Lax was attacked by name, referred to as "such a Zionist Oppressor," and the primary cause of all the problems on campus. PFC members included anti-Semitic tropes in the survey, accusing "Zionist" department chairs of causing "oppression" on campus.

151.   After reading the above-mentioned vitriol contained in the survey, President Schrader, distributed the survey to the entire Kingsborough campus via email. Outrageously, *every other* name in the survey was redacted, with Plaintiff Lax's name the only one left unredacted.

152.   Only weeks after receiving the EEOC letter of determination which overwhelmingly ruled in favor of Plaintiff Lax, President Shrader chose to humiliate Plaintiff Lax and circulate these repugnant comments to the entire Kingsborough campus despite the obvious negative impact they would have on Plaintiff Lax's social, emotional and career standing on campus. These acts, especially in such close proximity to the EEOC determination, were blatantly and clearly retaliatory.

153.   In or about July 2022, Defendants Schrader and Valente formed a seven-member committee to hire a new assistant dean for Diversity, Equity and Inclusion ("DEI"). Nonetheless, Defendants Schrader and Valente chose to include members from all of the

victimized communities in the search committee, *except* for Observant or Zionist Jews. This was despite the EEOC determination-confirmed instances of anti-Jewish discrimination on campus and an anti-Semitic violent hate crime committed by a Kingsborough student. Even after the absence of Jews on the committee was brought to her attention, Defendant Schrader refused to allow for their inclusion. It should be noted that despite the exclusion of Observant or Zionist Jews, the committee did include a member who openly supported the Boycott, Sanction and Divest ("BDS") movement against the state of Israel.

154.    On or about August 16, 2022, Plaintiff Lax contacted the CUNY diversity office to request an investigation of President Schrader regarding her repeated discriminatory and retaliatory actions detailed above, especially those taken after Plaintiff was found to have been discriminated against by the EEOC because he was an Observant and/or Zionist Jew. On or around September 9, 2022, Plaintiff Lax was contacted by Saly Abd Alla, the Chief Diversity Officer and Title IX Coordinator of the CUNY central office, who was assigned to investigate the above-mentioned matters.

155.    Plaintiff Lax was dismayed to discover that Saly Abd Alla was previously the civil rights director of the Minnesota chapter of the Council on American-Islamic Relations ("CAIR"), an aggressively anti-Zionist organization that supports the Boycott, Sanction and Divest ("BDS") movement against the state of Israel and has lobbied against the existence of the one-hundred-year-old Jewish Civil Rights organization, the Anti-Defamation League (ADL). CAIR was also an unindicted co-conspirator in the largest terror-finance case in American history, as it was tied to funneling money to Hamas, a group that has been designated as a terrorist-organization by Canada, the European Union, Israel, Japan, Australia, the United Kingdom, the United States and other countries. Hamas has committed terrorist attacks which

have killed thousands of Jews and Israelis; has advocated for the destruction of the State of Israel and has included in its charter such vile anti-Semitic canards as a Jewish plot to "take over the world."

156.   On or about September 12, 2022, Plaintiff Lax contacted Saly Abd Alla via email, requesting her position as to whether she could be an impartial investigator given her anti-Zionist background  and the nature of the discriminatory behavior against him. Saly Abd Alla never responded to Plaintiff Lax's email.

157.   Plaintiff Lax next contacted the vice chancellor of CUNY's human resources department regarding the impartiality of the investigation and received a non-substantive, boilerplate response regarding the university's commitment to equal opportunity. As of yet, CUNY has failed to remedy this situation.

158.   When taken in context, CUNY's appointment of an avowed anti-Zionist, Saly Abd Alla, to lead its investigation, including investigations into anti-Zionist discrimination, appears to be a bad faith attempt to suppress Plaintiff Lax's EEOC-substantiated concerns. At best, it demonstrates such extremely poor judgement, as to border on the farcical.

159.   Another recent incident which demonstrates the pervasive anti-Semitic hostility on campus and CUNY's continued refusal to remedy or address the matter, occurred in or about mid-September 2022.

160.   President Schrader distributed a campus-wide email that she does not tolerate hateful flyers on campus. Plaintiff Goldstein received this email, as well as approximately six phone calls from various faculty colleagues that flyers attacking him were distributed on campus and confiscated by the Kingsborough Public Safety department.

161.   Plaintiff Goldstein contacted the Public Safety department and was told that the

flyers were not about him, that they could not give him any more details, and they would not share a copy of the flyer with him.

162.    Plaintiff Goldstein next contacted Mickie Driscoll of the human resources department and Beth Douglas, Kingsborough's Executive Legal Counsel and Labor Designee regarding the flyers. Both would neither confirm nor deny whether the flyers were about Plaintiff Goldstein.

163.    Plaintiff Goldstein ultimately found out from a Kingsborough faculty member that the flyers were distributed by Professor Ryan Schiavone and two students, and were indeed about him. The flyers asserted that so-called "anti-racist" faculty and students were fighting against Plaintiff Goldstein because he "publicly attacked Muslim workers by calling them terrorists and Black workers with pro-confederate social media posts." The allegations contained in the flyers are completely baseless. The distribution of flyers containing baseless hatred against Plaintiff Goldstein are the fourteenth such instance in the past three and a half years.

164.    A copy of the flyer was eventually emailed to Plaintiff Goldstein on or around October 7, 2022. CUNY and Kingsborough have to date not conducted any investigation into this matter or taken any efforts to prevent what has by now become a common occurrence.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>

165.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

166.    Title VII prohibits discrimination against any employee on the basis of religion or ethnicity and holds an employer or labor organization liable for such conduct when, inter alia, the employer or labor organization knew of the discriminatory conduct and failed to take

immediate and appropriate corrective action or exercise reasonable diligence to prevent the discriminatory conduct from occurring.

167.   Defendant CUNY is an "employer," defendants Union and New Caucus are each a "labor organization," and Plaintiffs are each an "employee" within the meaning of Title VII.

168.   As described above, after Plaintiffs were subjected to discriminatory conduct on the basis of their religion/or ethnicity and complained about it to no avail. This includes, but is not limited to, CUNY's failure to take immediate and appropriate corrective action or exercise reasonable diligence to correct the discriminatory conduct and the Union, through its leaders and members aiding the discrimination and actively suppressing Ajibade's investigation in its preliminary stages, thereby subjecting Plaintiffs to a hostile work environment on the basis of their religion and/or ethnicity and significantly and negatively altering the conditions of their employment.

169.   Even after the Jackson Lewis report's finding that the Plaintiffs were discriminated against in violation of CUNY Policy and State and Federal Law, and after the EEOC Letter of Determination finding the same, CUNY, the Union and other Defendants still refused to take remedial efforts to address or even acknowledge the discrimination suffered by the Plaintiffs and other Observant and/or Zionist Jewish faculty members.

170.   CUNY, the Union and the other Defendants unlawfully discriminated against Plaintiffs with respect to the terms and conditions of their employment because of their religion and/or ethnicity. By virtue of the acts complained of herein, the hostile work environment at Kingsborough was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create a subjectively and objectively abusive/discriminatory work

environment.  By reason thereof, Defendants violated Title VII.

171.   As a direct and proximate result of Defendants' systematic and continuous unlawful harassment, multiple discriminatory practices and acts, and failure to address or correct the discriminatory conduct in violation of Title VII, Plaintiffs have, within the work atmosphere,  suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief, the amount of which is to be determined by a jury.

172.   Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violation of Title VII, for which Plaintiffs are entitled to an award of attorneys' fees and punitive damages.

### AS AND FOR A SECOND CAUSE OF ACTION

173.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

174.   NYSHRL prohibits discrimination against any employee on the basis of religion and/or creed and holds an employer or labor organization liable for such conduct when, inter alia, the employer or labor organization knew of the discriminatory conduct and failed to take immediate and appropriate corrective action or exercise reasonable diligence to prevent the discriminatory conduct from occurring.

175.   Defendant CUNY is an "employer," defendants Union and New Caucus are each a "labor organization," and Plaintiffs are each an "employee" within the meaning of NYSHRL.

176.   As described above, after Plaintiffs were subjected to discriminatory conduct on the basis of their religion and/or creed and complained about it. This includes, but is not limited to, CUNY's failure to take immediate and appropriate corrective action or exercise reasonable diligence to correct the discriminatory conduct and the Union, through its leaders and members aiding the discrimination and actively suppressing Ajibade's investigation in its preliminary stages, thereby subjecting Plaintiffs to a hostile work environment on the basis of their religion and/or creed and significantly and negatively altering the conditions of their employment.

177.   Even after the Jackson Lewis report's finding that the Plaintiffs were discriminated against in violation of CUNY Policy and State and Federal Law, and after the EEOC Letter of Determination finding the same, CUNY, the Union and other Defendants still refused to take remedial efforts to address or even acknowledge the discrimination suffered by the Plaintiffs and other Observant Jewish and/or Zionist faculty members.

178.   CUNY, the Union and the other Defendants unlawfully discriminated against Plaintiffs with respect to the terms and conditions of their employment because of their religion. By virtue of the acts complained of herein, the hostile work environment at Kingsborough was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create a subjectively and objectively abusive/discriminatory work environment. By reason thereof, Defendants violated NYSHRL.

179.   As a direct and proximate result of Defendants' systematic and continuous unlawful harassment, multiple discriminatory practices and acts, and failure to address or correct the discriminatory conduct in violation of NYSHRL, Plaintiffs have, within the work atmosphere,  suffered, and continue to suffer, severe mental anguish and emotional distress,

including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief, the amount of which is to be determined by a jury.

180.   Defendants' unlawful discriminatory actions constitute malicious, willful, and wanton violation of NYSHRL, for which Plaintiffs are entitled to an award of attorneys' fees and punitive damages.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>

181.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

182.   NYCHRL prohibits discrimination against any employee on the basis of religion and holds an employer or labor organization liable for such conduct when, inter alia, the employer or labor organization knew of the discriminatory conduct and failed to take immediate and appropriate corrective action or exercise reasonable diligence to prevent the discriminatory conduct from occurring.

183.   Defendant CUNY is an "employer," defendants Union and New Caucus are each a "labor organization," and Plaintiffs are each an "employee" within the meaning of NYCHRL.

184.   As described above, after Plaintiffs were subjected to discriminatory conduct on the basis of their religion and/or creed and complained about it. This includes, but is not limited to, CUNY's failure to take immediate and appropriate corrective action or exercise reasonable diligence to correct the discriminatory conduct and the Union, through its leaders and members aiding the discrimination and actively suppressing Ajibade's investigation in its

preliminary stages, thereby subjecting Plaintiffs to a hostile work environment on the basis of their religion and/or creed and significantly and negatively altering the conditions of their employment.

185.    Even after the Jackson Lewis report's finding that the Plaintiffs were discriminated against in violation of CUNY Policy and State and Federal Law, and after the EEOC Letter of Determination finding the same, CUNY, the Union and other Defendants still refused to take remedial efforts to address or even acknowledge the discrimination suffered by the Plaintiffs and other Observant and/or Zionist Jewish faculty members.

186.    CUNY, the Union and the other Defendants unlawfully discriminated against Plaintiffs with respect to the terms and conditions of their employment because of their religion. By virtue of the acts complained of herein, the hostile work environment at Kingsborough was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create a subjectively and objectively abusive/discriminatory work environment. By reason thereof, Defendants violated NYCHRL.

187.    As a direct and proximate result of Defendants' systematic and continuous unlawful harassment, multiple discriminatory practices and acts, and failure to address or correct the discriminatory conduct in violation of NYCHRL, Plaintiffs have, within the work atmosphere,  suffered, and continue to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief, the amount of which is to be determined by a jury.

188.    Defendants' unlawful discriminatory actions constitute malicious, willful, and

wanton violation of NYCHRL, for which Plaintiffs are entitled to an award of attorneys' fees and punitive damages.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>

189.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

190.    Under Title VII, it is unlawful for an employer or labor organization to retaliate against an employee who makes a good faith complaint in opposition to a discriminatory practice prohibited by Title VII.

191.    As described above, after Plaintiffs engaged in activity protected by the Title VII, Defendants retaliated by subjecting them to conduct that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

192.    As a direct and proximate result of Defendants' unlawful retaliatory conduct as described herein, Plaintiffs have, within the work atmosphere, suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief, the amount of which is to be determined by a jury.

193.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of Title VII, for which Plaintiffs are entitled to an award of attorneys' fees and punitive damages.

<u>AS AND FOR A FIFTH CAUSE OF ACTION</u>

194.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

195.   Under the NYSHRL, it is unlawful for an employer or labor organization to retaliate against an employee who makes a good faith complaint in opposition to a discriminatory practice prohibited by the NYSHRL.

196.   As described above, after Plaintiffs engaged in activity protected by the Title VII, Defendants retaliated by subjecting them to conduct that would dissuade a reasonable employee from making or supporting a similar complaint of discrimination.

197.   As a direct and proximate result of Defendants' unlawful retaliatory conduct as described herein, Plaintiffs have, within the work atmosphere, suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief, the amount of which is to be determined by a jury.

198.   Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYSHRL, for which Plaintiffs are entitled to an award of attorneys' fees and punitive damages.

## AS AND FOR A SIXTH CAUSE OF ACTION

199.   Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

200.   Under the NYCHRL, it is unlawful for an employer or labor organization to retaliate against an employee who makes a good faith complaint in opposition to a discriminatory practice prohibited by the NYCHRL.

201.   As described above, after Plaintiffs engaged in activity protected by the NYCHRL, Defendants retaliated by subjecting them to conduct that would dissuade a

reasonable employee from making or supporting a similar complaint of discrimination.

202.    As a direct and proximate result of Defendants' unlawful retaliatory conduct as described herein, Plaintiffs have, within the work atmosphere, suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering, for which they are entitled to an award of monetary damages and other relief, the amount of which is to be determined by a jury.

203.    Defendants' unlawful retaliatory actions constitute malicious, willful, and wanton violations of the NYCHRL, for which Plaintiffs are entitled to an award of attorneys' fees and punitive damages.

AS AND FOR A SEVENTH CAUSE OF ACTION
*(As and Against Defendants, the Union, and New Caucus)*

204.    Plaintiffs repeat, reiterate, and re-allege each and every allegation set forth above with the same force and effect as if more fully set forth herein.

205.    Under 42 U.S.C. §2000e-2(c)(1) through (3) (the "Duty of Fair Representation"), it is unlawful for a labor organization to discriminate against any individual, adversely affect an employee's status, to cause or attempt to cause an employer to discriminate against an individual, or to cause or attempt to cause an employer to discriminate against an individual.

206.    Defendants Union and New Caucus are each a "labor organization," and Plaintiffs are each an "employee" and an "individual" within the meaning of 42 U.S.C. §2000e-2(c)(1) through (3).

207.    As described above, after Plaintiffs were subjected to discriminatory conduct on the basis of their religion by Defendants Union and New Caucus. This includes, but is not

limited to, the Union and New Caucus, through their leaders and members aiding the discrimination and actively suppressing Ajibade's investigation in its preliminary stages, thereby subjecting Plaintiffs to a hostile work environment on the basis of their religion and significantly and negatively altering the conditions of their employment.

208.    Even after the Jackson Lewis report's finding that the Plaintiffs were discriminated against in violation of CUNY Policy and State and Federal Law, and after the EEOC Letter of Determination finding the same, the Union and New Caucus still refused to take remedial efforts to address or even acknowledge the discrimination suffered by the Plaintiffs and other Observant or Zionist Jewish faculty members.

209.    Defendants Union's and New Caucus' unlawful discriminatory actions constitute malicious, willful, and wanton violation of 42 U.S.C. §2000e-2(c)(1) through (3), for which Plaintiffs are entitled to an award of attorneys' fees and punitive damages.

<u>AS AND FOR AN EIGHTH CAUSE OF ACTION</u>

210.    Plaintiff Lax repeats, reiterates, and re-alleges each and every allegation set forth above with the same force and effect as if more fully set forth herein.

211.    At a Union function held in a Kingsborough room on April 4, 2019, defendants Schnee, Wetzel, Gartner, Alessandrini and Garland accosted Plaintiff Lax and when Plaintiff Lax attempted to leave, the defendants, intending to confine Plaintiff Lax, surrounded and cornered him, while simultaneously hurling vitriol at Plaintiff Lax. When Plaintiff Lax again attempted to leave, Gartner held his hand above Plaintiff Lax to stop him and said, "No. We're not done. We're just starting. We're just starting."

212.    During this ordeal, Plaintiff Lax was both frightened for his physical safety as well as emotionally humiliated. Plaintiff Lax subsequently filed a complaint with the

Kingsborough Department of Public Safety and Security, which neglected to investigate or take any corrective action.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs demand a jury trial and the following relief jointly and severally against the defendants:

a)   Granting an award of damages in an amount to be determined at trial to compensate Plaintiffs for all monetary and/or economic damages in connection with their claims, whether legal or equitable in nature, including back pay, front pay, and any other damages for lost compensation or employee benefits that they would have received but for the Defendants' unlawful conduct;

b)   Granting an award of damages to be determined at trial to compensate Plaintiffs for harm to their professional and personal reputations and loss of career fulfillment in connection with their claims

c)   Granting an award of damages to be determined at trial to compensate Plaintiffs for emotional distress and/or mental anguish in connection with their claims, including but not limited to, shame, humiliation, embarrassment, and mental distress;

d)   Awarding Plaintiffs their reasonable attorneys' fees, costs, and disbursements incurred in connection with this action, including, but not limited to, any expert witness fees;

e)   Granting an award of punitive damages, as provided by law

f)   Awarding pre-judgment and post-judgment interest, as provided by law;

g)   Declaring that the actions, conduct, and practices of the Defendants complained of herein violate the laws of the United States of America, State of New York and the City of New York;

h)      Granting preliminary and permanent injunctions against Defendants and their officers, owners, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the unlawful practices, policies, customs, and usages set forth herein;

i)      Granting an order restraining Defendants from any retaliation against Plaintiffs for participation in any form in this litigation; and

j)      such further and additional relief as the Court deems just and appropriate under the circumstances.

Dated: Woodmere, New York
       November 7, 2022

Yours, etc.,
THE ZWEIG LAW FIRM, P.C.

By: _____
      Jonah S. Zweig, Esq.
Attorneys for Plaintiffs
*Office and P.O. Address:*
999 Central Avenue, Suite 100-D
Woodmere, New York 11598
(718) 971-9716 Ext. 1
jzweig@zweigpc.com